# THE STATE v. RICHARDSON, Appellant.

### Division Two, March 6, 1906.

1. **INDICTMENT: First Degree Murder.** The indictment in this case, set out in the statement, is *held* to properly charge the crime of murder in the first degree.

2. **CONTINUANCE: Absent Witnesses: Defective Application: Discretion.** The granting or denying of an application for a continuance is a matter resting largely in the discretion of the trial court. And where the subpoena for witnesses alleged by defendant to be absent was not issued until two days before the day set for the trial, one of the intervening days being Sunday, and, in addition to this, the application fails to state that the facts expected to be proved by such absent witnesses are true, the trial court did not abuse its discretion in overruling the application.

3. **QUASHING PANEL: Motion for New Trial: Waiver.** A motion to quash the panel of jurors, which is overruled, if not called to the attention of the trial court in the motion for new trial, is waived, and is not subject to review by the appellate court.

4. **CHANGE OF VENUE: No Affidavit.** Where an application for a change of venue is not supported by the affidavit of at least two credible, disinterested witnesses, in addition to the affidavit of defendant, the application is properly denied.

5. **JUROR: Misconduct: New Trial.** A motion for new trial on the ground of the alleged misconduct of a juror is properly overruled, when it is not supported by the affidavit of defendant and his attorney, and it does not affirmatively appear that the defendant did not know of such alleged misconduct before the jury retired to consider their verdict.

6. **EVIDENCE: Of Wife Against Husband: Admission: Defendant Under Arrest.** Over the objection and exception of defendant, a witness for the State was permitted to testify that he went to the jail to see defendant and his (defendant's) wife, both of whom were confined on the charge of murder; that "Mrs. Richardson (defendant's wife) said she saw them .

(deceased and another) coming towards the gate out there and her husband went there; as they got there they got in a quarrel, and she said her husband said he wanted to shoot; she said she didn't want him to shoot, she begged him not to shoot, and Mr. Richardson said that's not right, and Schade (the jailer) said he could not talk more in jail; nothing more was said." *Held, first,* that this testimony was not admissible as a silent admission by defendant, because, according to the witness, he expressly denied its correctness; *second,* it was not admissible as an admission against defendant's wife, for it was in her favor; *third,* defendant's wife being incompetent to testify as a witness against him, her declarations to a third party, as to what her husband said, were also inadmissible. *Held,* further, that it is questionable whether this evidence was admissible, even if defendant had remained silent at the time the statement was made by his wife, for the reason that he was then in the custody of the sheriff and jailer, and was not in a position to speak.

7. **REPUTATION OF DEFENDANT: For Peace and Quiet: Not in Issue.** Where defendant has not put his reputation for peace and quiet in issue, the State can not assail his character by proving his reputation as a quarrelsome and turbulent man, since such reputation does not affect his credibility as a witness, but goes only to his character as a defendant.

8. **DEGREES OF HOMICIDE: Defendant's Testimony: Instructions.** Instructions should be given on whatever degrees of homicide defendant's testimony may show, notwithstanding, in view of the other evidence, his statements as to the homicide may seem inconsistent and unreasonable.

Appeal from Cape Girardeau Circuit Court.—*Hon. Henry C. Riley,* Judge.

Reversed and remanded.

*Orren Wilson* for appellant.

(1) The court erred in overruling defendant's application for a continuance. (2) The court erred in overruling defendant's application for a change of venue. (3) The court should have given the instruction on justifiable homicide in the fourth degree. R. S. 1899, sec. 1833.

*Herbert S. Hadley,* Attorney-General, and *N. T. Gentry,* Assistant Attorney-General, for the State.

(1)   The indictment is sufficient; it contains every element necessary to charge defendant with murder in the first degree.   State v. Bailey, 88 S. W. 735; State v. Turlington, 102 Mo. 647.   (2)   No error was committed by the court in overruling defendant's application for a continuance.   State v. Williams, 170 Mo. 204; State v. Cummings, 88 S. W. 706; State v. Dusenberry, 112 Mo. 291; State v. Kindred, 148 Mo. 281.   The affidavit fails to state that the facts he expected to prove by said absent witnesses are true; this is fatal.   State v. Alfred, 115 Mo. 471; State v. Cummings, 88 S. W. 706; R. S. 1899, sec. 2600.   (3)   The motion to quash the panel of jurors, for the reason that the same was not selected from the entire county, was properly denied. State v. Brennan, 164 Mo. 487; State v. Fraker, 137 Mo. 258.   No mention of this alleged error is made in the motion for a new trial, hence the same has been waived. State v. Bell, 166 Mo. 109.   (4) Defendant's application for a change of venue was properly overruled.   It was not in the proper form, and was not supported by the affidavit of two creditable, disinterested citizens of the county, as required by the statute.   The reason for such failure, as given by defendant, did not entitle him to a change of venue.   State v. Turlington, 102 Mo. 648; State v. Brownfield, 83 Mo. 448; R. S. 1899, sec. 2576. (5)   As both defendant and his wife were charged with murder, and were tried jointly, it was proper to admit in evidence statements made by either one, as evidence against that one, because both were on trial.   The weight to be given to said admissions should be, and in this instance were, governed by instructions.   State v. Tolbert, 73 Mo. 359.

FOX, J.—This cause is here upon appeal by the defendant from a judgment of the circuit court of Cape

Girardeau county, Missouri, convicting him of murder of the first degree. The indictment upon which defendant was tried was returned by the grand jury on January, 2, 1905, charging James Richardson and Phoebe Richardson, his wife, with murder in the first degree. Omitting formal parts, the offense was thus charged:

"The grand jurors of the State of Missouri, duly empaneled, sworn and charged to inquire within and for the county of Cape Girardeau, State aforesaid, on their oaths present and charge, that James Richardson at the said county and State, on or about the 22d day of August, A. D., 1904, in and upon one Wm. Bleckwendt, then and there being willfully, feloniously, on purpose, deliberately, premeditatedly and of his malice aforethought did make an assault, and with a dangerous and deadly weapon, to-wit, a shotgun, then and there charged and loaded with gunpowder and lead shot which he, the said James Richardson, in his hands then and there had and held, then and there willfully, deliberately, on purpose, premeditatedly and of his malice aforethought, feloniously, did discharge and shoot off, at, to and against the body of him, the said Wm. Bleckwendt, and with the shotgun aforesaid, and the leaden shot aforesaid, then and there feloniously and on purpose and of his malice aforethought, willfully, deliberately and premeditatedly, did shoot, strike, penetrate and wound him, the said Wm. Bleckwendt, in and upon the back and body of him, the said Wm. Bleckwendt, giving him, the said William Bleckwendt, then and there with the dangerous and deadly weapon, the shotgun aforesaid, and the gunpowder and the leaden balls aforesaid, so as aforesaid shot out of the shotgun aforesaid, by the force of the gunpowder aforesaid, in and upon the back and body of him, the said William Bleckwendt, divers wounds and one mortal wound of the breadth of one quarter of an inch, and the depth of three inches, of which said mortal wound the said William Bleckwendt then and there did die.

"And the grand jurors aforesaid, upon their oath aforesaid, do further find, present and charge that Phoebe Richardson, before the said felony and murder was committed in the manner and form aforesaid, and by the means aforesaid, at the time and place aforesaid, and also at the time did then and there willfully, deliberately, premeditatedly and of her malice aforethought, feloniously, incite, move, procure and aid with said shotgun and with a deadly weapon, to-wit, a large club, and counsel, hire and command him, the said James Richardson, to do and commit the said murder aforesaid, in the manner and form aforesaid, and by the means aforesaid at the time and place aforesaid, to do and commit; and so the grand jurors aforesaid, upon their oaths aforesaid, do say that James Richardson and Phoebe Richardson, him, the said William Bleckwendt, at the time and place aforesaid, in the manner and by the means aforesaid, feloniously, on purpose, willfully, deliberately, premeditatedly, and of their malice aforethought, did kill and murder, contrary to law and against the peace and dignity of the State."

At the May term, 1905, of the circuit court of said county the defendant, James Richardson, and his wife, Phoebe Richardson, were jointly tried for the commission of the offense charged in the indictment. Defendant's wife, Phoebe Richardson, was acquitted and he was convicted.

Upon the trial of this cause the evidence introduced by the State tended to prove that the defendants, James Richardson and Phoebe Richardson, were husband and wife, and lived in a house about 150 yards from the place of the fatal difficulty. That Seehausen, Mortensen, May and Meyestedt visited the home of Mary Le-Grand on August 21, 1904, and took some beer with them. This home was a house-boat, situated on a slough of Sloan's creek in a meadow in Dannybrook, a suburb of the city of Cape Girardeau, and was about 100 yards from the public road. It was practically admit-

ted that Mary LeGrand was a woman of bad repute, she having been married, but living part from her husband, and that she kept a bawdy house and that deceased was a frequent visitor at the house. After remaining at this shanty boat for sometime, variously estimated at from half an hour to two hours, the deceased came, and the other men left, three of them going in the direction of a spring wagon. After reaching this wagon the three drove to a gate, which opened into a public road, a gravel road; this was about midnight. This road ran north and south, and separated the land of defendant from that owned by Mrs. Sullivan, defendant's being on the west and Mrs. Sullivan's on the east of said road. This house-boat was situated on the bank of the creek on Mrs. Sullivan's land. The deceased and the LeGrand woman walked along with the men in the wagon for the purpose of opening and shutting the gate. As the three men drove off in the spring wagon, they met a man and woman on the road coming from the direction of the defendant's house, and going towards this gate. It was a bright moonlight night, and all the witnesses seem to have had no trouble in recognizing persons, even at some distance. After driving up the road a little ways, these three men heard the report of a gun, and one of them returned and found deceased suffering from the effects of a number of wounds in the back. The only eye-witnesses to the shooting were the LeGrand woman and both of the defendants. After the three men drove off in the spring wagon, the LeGrand woman testified, she and the deceased heard someone coming down the road, looked up and recognized the defendant walking rapidly towards them. As defendant neared the gate, he called out, "Hi, you God damn sons of bitches, you want to leave our cows alone." Mrs. Richardson, who was then by the side of her husband, came up to the gate and said, "O, you God damn old whore, we are going to kill you." Mrs. Richardson then began striking deceased on the arm with a board and saying to her husband,

"Shoot them, shoot them sons-of-bitches." At that time deceased and the LeGrand woman were inside the gate on the Sullivan ground, deceased near the gate and the LeGrand woman some eighteen feet away. Deceased and the LeGrand woman turned and started to walk off and leave the Richardsons, deceased saying, "They would not hurt us." A shot was then fired by defendant, James Richardson, and deceased instantly cried out, "O, my God, I am shot." The LeGrand woman helped deceased walk to the house-boat, when he sank down. Some of the neighbors came in, and Mr. Taylor and the LeGrand woman ran for a physician. One of the neighbors, Mrs. Eva Doll, who lived near by, testified that she heard Mrs. Richardson say, "O, God damn your dirty souls, I have got you now and I am going to murder you." Then she heard one shot, and deceased cried out, "O, my God, I am shot, I am dying." Deputy sheriff Grieb, who was also chief of police of Cape Girardeau, on learning that a man had been shot, started in a hack in company with Dr. Patton. On the way they met the LeGrand woman, who wanted them to hurry, as the man was about to die. Dr. Patton testified that he examined the deceased shortly after the shooting and found him suffering from a gun shot wound in the back, and that the whole of his back was perforated with small buck shot. That the deceased was carried out of the boat towards the hack, but that he died in thirty minutes; that the wounds were mortal. This physician and the undertaker testified that all of the buckshot took effect in the back of the deceased, and entered at points ranging from the back of the neck down to the waist line. They also testified to the bruises on the arm of the deceased, which bruises were inflicted before his death, in their judgment. After the shooting, officer Grieb and policeman Blank went to defendant's home, reaching there about half past one o'clock. James Richardson was in bed, and Mrs. Richardson came to the front door. She told the officers that defendant was sick

in bed and could not see them, and insisted on them not coming in. In fact, she stood in the door and said that no one could come in without a row. After considerable trouble and some threats, the officers succeeded in passing Mrs. Richardson and arrested her husband. They asked for the gun, but Mrs. Richardson said that there was no gun in the house. The next morning the officers returned and found the gun in the house, in a corner behind the safe or wardrobe. The gun was a double-barreled one, and the right barrel showed that it had recently been discharged but had been reloaded. After the gun was found in her house, Mrs. Richardson stated to the officers that her husband had killed a milk thief, and now they had taken him to jail. Afterwards during the day, Mrs. Richardson said to some persons near the place of shooting, "God damn him, that is what he gets for fooling with other people's cows." After she was placed in jail, Mrs. Richardson stated to Albert Sheute, in the presence of her husband, that her husband went down to the gate to shoot deceased, and she she begged him not to shoot him.

Mrs. Richardson did not testify; but defendant James Richardson did. In behalf of said defendant, the evidence tended to show that he had a little place in the surburbs of Cape Girardeau, owned a few cows and sold milk. That there was an unfriendly feeling existing between him and the LeGrand woman, he having made complaint charging her with running a bawdy house, to which she entered a plea of guilty. That defendant had some trouble with some people bothering his stock and milking his cows. That Mary LeGrand frequently visited his place at night and milked his cows. That on the night of this difficulty, defendant's dog awakened him by barking and chasing someone out of the milk lot. When he got up he saw the LeGrand woman and some one else milking defendant's Jersey cow. That these persons soon got up and left the milk lot; and defendant dressed himself and went down the road and

his wife followed him. On aproaching the LeGrand woman and the deceased, defendant said, "You want to go away and leave my dog and cows alone." Defendant admitted that he and his wife were in the road, and deceased and the LeGrand woman were not in the road, but were inside of the Sullivan enclosure. That when his (defendant's) wife got up to the gate, deceased tried to grab a board, but defendant's wife grabbed it. That deceased reached down and struck at them with a razor and tried to cut defendant's wife. That defendant then raised his gun, and the gun went off. Defendant admitted that he saw deceased and the LeGrand woman before he left his house, and also that he loaded his double-barreled shotgun and went after them. He further testified that the LeGrand woman stood a short distance away with a revolver in one hand and a tin bucket in the other; and that the bucket had about one gallon of milk in it. Defendant denied that any one used a board that night, but said that they tried to use it. Defendant offered, and the trial court admitted, in evidence the record of the police court of Cape Girardeau, showing the conviction of the LeGrand woman on a charge of running a bawdy house.

In rebuttal, the State proved by Meyestedt and others that they had only driven a very short distance from deceased and the LeGrand woman before they heard the gun fire; that in their opinion only about thirty seconds had elapsed.

At the conclusion of the evidence the court instructed the jury upon murder in the first and second degree, self-defense, reasonable doubt, etc. The cause was submitted to the jury upon the evidence and instructions of the court and they returned a verdict finding the defendant guilty of murder in the first degree as charged in the indictment, also a verdict finding the defendant, Phoebe Richardson, wife of the defendant, not guilty.

The instructions of the court will be given due consideration in the course of the opinion.

Motions for new trial and in arrest of judgment were filed and by the court overruled, and judgment and sentence was rendered against the defendant in accordance with the verdict returned by the jury. From this judgment the cause is brought here by appeal and the record is now before us for consideration.

### OPINION.

The record in this cause discloses many complaints by appellant at the action of the trial court as a basis for the reversal of this judgment. At the very inception of the consideration of this very important cause it is not inappropriate to say that many of the assignments of error are absolutely without merit, and many others are assigned which are not properly preserved by the record as to render them subject to review upon this appeal. The serious results flowing from the enforcement of this judgment, should it be affirmed, have lead us to carefully scrutinize every detail of this record, and we will give the questions presented in it such attention and consideration as their importance require and merit.

I. The indictment in this cause properly charged the offense in such terms as have repeatedly met the approval of this court, and there was no error in the action of the court overruling defendant's motion to quash such indictment.

II. There was no error committed by the court in overruling defendant's application for a continuance. The granting or denying of an application for a continuance, as has often been ruled by this court, is a matter resting largely in the discretion of the trial court, and it is only where it is manifest that such discretion has been abused and not rightfully or judicially exercised that this court will interfere with the action of the trial court upon that subject. It is apparent from the disclosures of the record, as to the grounds alleged for

such continuance, that there was in no way any abuse of a proper judicial discretion. The record discloses that the subpoena was not issued for the witnesses claimed to be absent until two days before the day set for the trial, and one of the intervening days was Sunday. Emphasizing the correctness of the action of the trial court in denying the application for a continuance, it may be further stated that the affiant did not conform to the essential requisites of the statute, in this, that he failed to state that the facts he expected to prove by such absent witnesses were true. [State v. Alred, 115 Mo. 471; State v. Cummings, 189 Mo. 626; R. S. 1899, sec. 2600.]

III. Defendant filed a motion to quash the panel of jurors returned by the sheriff to try his cause, assigning as reasons for such motion that the jurors were not selected from the entire county. This motion was by the court overruled, and it is upon this action of the court that appellant insists there was reversible error committed in the trial of this cause. It is sufficient to say of this ground of complaint that it is nowhere called to the attention of the trial court in the motion for new trial, and therefore must be treated as having been waived, and is not subject to review by this court.

IV. Appellant complains at the action of the court in denying his application for a change of venue. It is only necessary to say upon this proposition that the record discloses an entire failure to conform to the requirements of the statute in respect to such applications. Section 2576, Revised Statutes 1899, requires that the petition of the applicant shall be supported by the affidavit of the petitioner and the affidavit of at least two credible, disinterested citizens of the county wherein such cause is pending. While the petition in this cause indicates that the applicants supported the petition by their affidavits, yet the record discloses an entire absence of any supporting affidavit by other witnesses as

is required by the statute. This was fatal to the application. [State v. Turlington, 102 Mo. l. c. 653; State v. Brownfield, 83 Mo. 448.]

V. Complaint is urged upon the ground of the misconduct of juror Hinton, one of the panel who was selected to try this cause. The evidence upon the subject of his misconduct shows that he was a merchant and that his clerk brought him two letters and gave them to him in the presence of the sheriff; that one of these letters contained a check or draft from a bank and the other letter was from the Elks' lodge and simply had reference to some of the members that were to be initiated. This alleged misconduct was simply called to the attention of the trial court in the motion for a new trial and such motion was neither accompanied by the affidavit of defendant nor of the defendant's attorney. It is nowhere made to appear at what time this alleged misconduct of the juror came to the knowledge of the defendant or his counsel.

It was expressly ruled in State v. Robinson, 117 Mo. 666, that where misbehavior of a juror is charged as having occurred during the trial, it must affirmatively appear that the party complaining thereof did not know of the fact before the jury retired to consider of their verdict, and it was said in that case that this material fact not being disclosed in the affidavit filed, the statement of it in the motion for new trial is no evidence of its existence. If the complaining party knew during the trial of such misbehavior it was his duty to call the immediate attention of the court to it and not take his chances on a reversal based on such ground. [State v. Robinson, 117 Mo. l. c. 666; 12 Ency. Plead. & Prac., 558; State v. Barrington, not yet reported.]

It was said in discussing a complaint similar to this one, as to the misconduct of a juror, in State v. Hunt, 141 Mo. l. c. 637, that, ''Moreover the motion for a new trial upon the ground suggested in the proposed

194 Sup—22

amendment and in the supplemental motion, was not supported by the affidavit of the defendant, which was absolutely essential. It must have been supported by both the affidavit of the defendant and his counsel; nothing less will answer the behests of the law. [State v. Howard, 118 Mo. 127; State v. Burns, 85 Mo. 47.]''

With the disclosures of the record as our guide, there was no error in overruling the motion for new trial on this ground.

VI.   This leads us to the consideration of the most serious ground for a reversal of this judgment and sentence disclosed by the record, that is, the admission of incompetent and improper testimony against the defendant. The record discloses that Albert Sheute was introduced by the State and he testified that he and his wife were in the town of Jackson where the defendant, James Richardson, and his wife, Phoebe Richardson, were confined in jail, and this witness testified that he and his wife wanted to see them. They went over to the jail and this witness states, in answer to a question, that ''Mrs. Richardson said she saw them coming towards the gate out there and her husband went there; as they got there they got in a quarrel, and said her husband said he wanted to shoot; she said she didn't want him to shoot, she begged him not to shoot (and Mr. Richardson said that's not right, and Schade said could not talk more in jail, nothing more was said).'' The following further inquiry was made of this witness by the State as to what Mrs. Richardson said:

Q.   You speak in such an undertone I do not understand you, and I do not think the jury do. What did she say—that who wanted to shoot? A.   Mr. Richardson wanted to shoot, she said not to shoot.

Q.   Shoot who? A.   Well, that fellow Will Bleckwendt.

Q.   Now let me see if I understand you right. Mrs. Richardson said that her husband wanted to shoot

Bleckwendt, and she did not want him to do it? A. Yes, sir.

Court: Let the witness state.

Mr. Daues: If I cannot hear I want to know what he says.

Court: I think the jury heard it. It is not necessary to repeat it.

Q. What did Mr. Richardson say? A. He says let him tell it, it was not right, and Mr. Schade said could not have more talk in jail, not to say any more, and that was all said.

We are unable to conceive upon what theory this testimony was admissible. It was not admissible on the ground of a silent admission by reason of the statement of Mrs. Richardson in his presence, for the reason that the witness who detailed the conversation says that this defendant said that the statement was not right, and wanted to make it himself, and Mr. Schade, who evidently was the officer in charge, would not permit any more talking between them. It was not admissible simply as an admission against Mrs. Richardson, for the statement was in her favor; she expressly said that he did not want him to shoot, and it will further be oberved that the court, in admitting this testimony, did not, either by suggestion or otherwise, limit its application to her. That this testimony was damaging and injurious to only one of these defendants, and that was the defendant who was convicted, is too clear for discussion. This testimony was directed solely against the defendant James Richardson, and no one else, and was inadmissible for two reasons: First, because the defendant said at the time that the statement was not right, and therefore there could be no acquiescence or assent to it; secondly, Mrs. Richardson, who was making the statement against this defendant, was his wife. She was incompetent as a witness to testify to such statement so made, and it necessarily follows that if she could not make the statement as a witness she could

not make it to a third party, and have him repeat it and thereby violate one of the fundamental rules of evidence applicable to the competency of witnesses, that is, that it is incompetent for the wife to give evidence against the husband, except in the case where she is the immediate prosecutrix for some injury threatened or done to her person. In State v. Arnold, 55 Mo. l. c. 91, WAGNER, Judge, speaking for this court, thus clearly announced the rule. He said: "Nothing is clearre than that it is incompetent for the wife to give evidence against the husband except in the case where she is the immediate prosecutrix for some injury threatened or done to her person. If she herself is not a competent witness, it follows, that her declarations as to what her husband said must also be inadmissible."

To this testimony the record discloses a timely objection and exception. We can see no difference in the admission of this testimony in the form of statements made by Mrs. Richardson to witness Sheute and in introducing Mrs. Richardson herself as a witness to testify against the defendant, which it must be conceded would have been manifestly improper and erroneous. It is clear that the jury could have only considered this testimony as against the defendant James Richardson, for it had no application to anyone else. It will be observed from the record in this cause that the court very properly excluded, as against this defendant, James Richardson, all statements made by his wife not in his presence, and the record discloses that this is the only statement made by Mrs. Richardson in the presence of the defendant.

Emphasizing the error in admitting this statement, the court, by instruction No. 7, practically left it to the jury to determine whether or not this statement was assented to or acquiesced in by the defendant. The jury are told in that instruction that what Mrs. Richardson said cannot be used against the other defendant, James Richardson, unless assented to or acquiesced in by him.

That amounted to nothing more nor less (notwithstanding this defendant, James Richardson, said in the presence of the witness who testified to the statement of Mrs. Richardson, that her statement was not right), than saying to the jury, "You must determine from the surrounding circumstances whether he assented to or acquiesced in such statement." It is a very questionable legal proposition, even if the defendant, at the time this statement was made, had remained silent, as to whether or not it was admissible against him, for the reason that he was then in the custody of the sheriff and jailor and and was not in a position to speak.

It was ruled in the case of State v. Young, 99 Mo. l. c. 674, that a defendant who was under arrest was in no position to make any denial as to what might be said by others in his presence, and that his silence under such circumstances would not warrant any inference against him. [Wharton's Crim. Ev., sec. 680; Com. v. Walker, 13 Allen 570; U. S. v. Brown, 4 Cranch (C. C.) 508; Com. v. Kenney, 12 Metc. 235; Rex v. Appleby, 3 Starkie 33; Bob v. State, 32 Ala. 560.] To the same effect is case of State v. Foley, 144 Mo. l. c. 618, where this court approved the ruling in the Young case, and, in discussing this proposition, said: "Of course, there are cases in which silence of a party suspected of crime is evidence against him, but to give such silence the effect of an admission the party must be in a position to explain and it is the settled law of this State that a defendant's silence when charges are judicially made against him or he is under arrest can not be shown against him."

In view of the well-settled law upon this subject we see no escape from the conclusion that the admission of Mrs. Richardson's statement at the jail to witness Scheute, which amounted to nothing more nor less than permitting her to testify against her husband, must be held error for which the judgment must be reversed and cause remanded.

As this cause must be retried, we deem it not inappropriate to suggest another error committed in the trial of it, which, if it had been duly preserved by timely objections and exceptions, would be sufficient to reverse the judgment. That was this: Before the defendant attempted to offer any testimony as to his good reputation for peace and quiet the court permitted counsel for the State to inquire of the witness Fred Kraft if he knew of James Richardson, the defendant, having shot at any other person there in Cape Girardeau; upon the witness answering, "No sir, none that I know of," the additional inquiry was permitted: "Did you ever hear of it?" and the witness answered, "Well, yes, sir, I have heard them talking about it." This testimony was clearly incompetent and upon timely objections doubtless would have been excluded, but as there were no objections made to it we cannot base our action in the reversal of this judgment upon that ground. The additional inquiry was made of this witness as to whether or not he knew the general reputation among the neighbors and friends of the defendant, for being a violent, quarrelsome and turbulent man. The answer was in the affirmative, stating that, "it seems like he was quarrelsome and could not get along with anybody." Then followed the additional question as to his being a dangerous man. This was answered by relating a conversation between the witness and Mr. Blank about hauling through a pasture, and finally a threat by the defendant against Blank. This testimony was not admissible. The defendant had not put in issue his reputation for peace and quiet, and while the defendant had testified as a witness, his general reputation as a dangerous and turbulent man is not admissible for the purpose of affecting his credibility.

It will be noted that the law, as applicable to the general reputation of a defendant or a witness, affecting their credibility, makes a distinction between general moral character and general reputation for being a

quarrelsome and dangerous man. The former may affect his credibility as a witness, the latter does not. In other words, general moral depravity has a tendency to affect the credibility of a witness; but, on the other hand, a man may have the reputation of being quarrelsome and dangerous, and still be a truthful man. The law as now settled may thus be briefly stated as applicable to the subject in hand: If the defendant offers himself as a witness, the State, for the purpose of affecting his credibility, even though he has offered no testimony upon his general reputation, may offer in evidence testimony showing his general reputation, either for truth and veracity, or for general immorality. But, if the defendant does not first put his general reputation for peace and quiet in issue, by offering some testimony on that subject, the State is not permitted to offer testimony of his general reputation as being a turbulent, quarrelsome or dangerous man, for the purpose of affecting his credibility. But, on the other hand, if the defendant puts his reputation for peace and quiet in issue by offering testimony along that line, then, of course, the State has the right to rebut such showing by offering testimony showing his general reputation as a turbulent, quarrelsome and dangerous man.

In State v. Nelson, 101 Mo. l. c. 468, a witness by the name of Ferrill had testified for the State and the defendant offered testimony tending to show that he had the reputation of being a rash, dangerous and turbulent man when in liquor. This testimony was excluded by the trial court, and on this point, Judge BLACK, speaking for the whole court, said: "Nor was there any error in excluding evidence offered by the defendant to show that Ferrill, one of the witnesses for the State, had the reputation of being a rash, dangerous and turbulent man when in liquor. We do not see for what purpose this evidence was offered, unless it was to discredit the evidence given by Ferrill, and it was certainly not competent for that purpose."

At the present sitting of this court, in the case of State v. Beckner, *ante,* p. 281, this question is fully and most thoroughly treated in an opinion by Judge GANTT. All of the authorities in this State, as well as in other jurisdictions, are fully reviewed, and the conclusion is finally announced that the general reputation of a defendant or a witness for being a violent, turbulent and dangerous man does not in any way cast any light on or affect his credibility, and it was ruled in that case that the defendant not having offered any testimony as to his reputation for peace and quiet, it was reversible error for the State to introduce testimony as to his reputation for being a violent, dangerous and turbulent man. However, it is unnecessary to pursue this subject further; it is merely a suggestion which may be observed in the trial of this cause. There was no objection or exception to the introduction of this testimony; therefore, it is not subject to reveiw by this court for the purpose of basing any affirmative action upon it; and we do not wish appellant's counsel to understand that we are treating of this error even though no objections or exceptions are preserved in the record, for it is certain that if the fate of this defendant rested upon these suggestions of errors without any objections or exceptions having been preserved, they would be of no avail.

Upon the subject of instructions, it is sufficient to suggest that, upon the retrial of this cause, whatever grades of the crime the defendant's testimony may tend to prove should be covered by appropriate instructions based upon his testimony. It may be that his testimony, in view of the testimony on the part of the State, may not be true; however, he is entitled to instructions presenting the grades of crime to which his testimony is applicable. We, of course, cannot foreshadow what the testimony will be in the retrial of this cause; however, we take it that in the event that the defendant testifies that there was a personal encounter between the deceased and the defendant's wife, and further testifies

that he simply started to raise the gun with a view of checking such violence to his wife, and that the gun fired before he got it to his shoulder, and that he did not intend to fire the shot, notwithstanding, in view of the other testimony in the cause, the statements may seem unreasonable and inconsistent, yet the court will instruct upon that grade of manslaughter to which such testimony is applicable.

We have thus given expression to our views upon the questions presented by the record. The penalty of this judgment can only be justified and enforced by a trial that is absolutely free from any substantial error. We have indicated the errors during the progress of the trial, for which the judgment in this cause should be reversed. Nothing remains to be said except to announce the conclusion, that for the error herein pointed out, the judgment should be reversed and the cause remanded for a new trial, and it is so ordered.

All concur.